JUDGE KOELTL

**22 MC 00320**

**UNITED STATES DISTRICT COURT
THE SOUTHERN DISTRICT OF NEW YORK**

IN THE MATTER OF THE APPLICATION
OF ADIDAS AG FOR AN ORDER OF
ATTACHMENT IN AID OF ARBITRATION

Misc. No: _____

**FILED UNDER SEAL**

**PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S
*EX PARTE* PETITION FOR ORDER OF ATTACHMENT**

Mark P. Goodman (mpgoodman@debevoise.com)
William H. Taft V (whtaft@debevoise.com)
Floriane Lavaud (flavaud@debevoise.com)

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000 (Main Office Number)

*Counsel for Petitioner adidas AG*

Dated: New York, New York
      November 11, 2022

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ..........................................................................................................2

 A. The Parties ........................................................................................................... 2

 B. The Contractual Framework ................................................................................ 3

  1. Marketing Funds ...................................................................................... 3

  2. Agreement to Arbitrate ............................................................................ 4

 C. Ye's Pattern of Misconduct ................................................................................. 4

ARGUMENT .................................................................................................................................7

I. The Court Has Jurisdiction ...............................................................................................7

II. The Court Should Issue An *Ex Parte* Order Of Attachment .............................................9

 A. The *Ex Parte* Order of Attachment should be issued under New York law ........... 9

 B. Alternatively, the Court should exercise its equitable authority to issue an order of attachment ................................................................................................ 13

III. The Order Of Attachment Should Encompass All Of Defendant's Accounts At JP Morgan Up To The Amount of $75 Million. ...................................................................15

CONCLUSION ............................................................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*Capital Ventures Int'l v. Rep. of Arg.*, 443 F.3d 214 (2d Cir. 2006) ..............................................12

*Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012 (2d Cir.1993) .........................................8

*County Natwest Sec. Corp. USA v. Jesup, Josephthal & Co.*, 579 N.Y.S. 2d 376 ........................12

*Deckert v. Indep. Shares Corp.*, 311 U.S. 282 (1940) ...................................................................13

*Discover Growth Fund v. 6D Global Technologies Inc.*, 2015 WL 6619971 ..........................11,12

*Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc.*, 77 F. Supp. 2d 199 (D. Mass. 1999) ..................................................................................................................................13

*Mishcon de Reya New York LLP v. Grail Semiconductor, Inc*., 11 cv 04971(RJH) 2011 WL 6957595 (S.D.N.Y. Dec. 28, 2011) ....................................................................11

*Moquinon, Ltd. v. Gliklad*, 2017 WL 1482163 (Sup. Ct. N.Y. Co. April 6, 2017) .......................12

*New Falls Corp. v. Soni Holdings, LLC*, No. CV19449ADSAKT, 2019 WL 4015170 (E.D.N.Y. July 5, 2019) ...............................................................................14

*Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, No. 11 CIV. 3489 JMF, 2013 WL 1915330 (S.D.N.Y. May 9, 2013) ...................................................................................14

*Pike v. Freeman*, 266 F.3d 78 (2d Cir.2001) ..................................................................................8

*Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of VA*., 144 F. Supp. 2d 241 (S.D.N.Y. 2001) .........................................................................................13

*Shamrock Power Sales, LLC v. Scherer*, No. 12CV8959KMKJCM, 2016 WL 6102370 (S.D.N.Y. Oct. 18, 2016) ..................................................................................13, 14

*Sivault Sys., Inc. v. Wondernet, Ltd.*, 05 cv 0890(RWS), 2005 WL 681457 (S.D.N.Y. Mar. 25, 2005) .....................................................................................................11

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc*.,198 F.3d 88 (2d Cir. 1999)...........................................................................................................8

*United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489 (4th Cir. 1999) .......................13

*Wishnatzki & Nathel, Inc. v. H.P. Island–Wide, Inc.*, 2000 WL 1610790 (S.D.N.Y. Oct. 27, 2000) ......................................................................................................14

**Statutes & Other Authorities**

JAMS Rule 24(e) ..................................................................................................................4

N.Y.C.P.L.R. § 6201............................................................................................................10

N.Y.C.P.L.R. § 6211.........................................................................................................9,10

N.Y.C.P.L.R. § 7502........................................................................................................9, 12

9 U.S.C. § 201 *et seq*............................................................................................................7

9 U.S.C. § 202......................................................................................................................8

9 U.S.C. § 203......................................................................................................................7

28 U.S.C. § 1331................................................................................................1, 9, 10, 11

28 U.S.C. § 1332..................................................................................................................8

**PRELIMINARY STATEMENT**

After suffering considerable damage to its brand as a result of the well-publicized racist, antisemitic, and other offensive public statements and conduct of Ye (formerly known as Kanye Omari West), adidas AG ("**adidas**"), effective November 5, 2022, terminated its business relationship with Ye and his companies, Yeezy, LLC, its affiliate Yeezy Footwear, LLC, and Yeezy Marketing LLC (together with Ye, collectively "**Yeezy**").  adidas now intends to commence arbitration under the parties' 2017 License and Endorsement Agreement (the "**2017 Agreement**"), and seeks the Court's assistance to preserve funds belonging to adidas, but currently in Respondent's possession, pending resolution of that arbitration.

Pursuant to the now-terminated 2017 Agreement, during 2022 alone adidas paid $75,000,000 into accounts controlled by Yeezy for the express and limited purpose of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ in connection with the parties' partnership (the "Marketing Funds").  The most recent $25,000,000 of that sum was deposited into a bank account maintained in New York City at JP Morgan Chase N.A. (the "**Garnishee**"); the remaining balance, which was originally deposited into an account in Wyoming, is likely to also have been transferred to Garnishee by Yeezy.  Under the terms of the 2017 Agreement, upon termination, ownership of any unused Marketing Funds reverted to adidas.  Although adidas has demanded return of the Marketing Funds, its demand has been met with silence.  Moreover, based on public reports that Garnishee intends to close Yeezy's accounts by November 21, 2022, Respondents will at any moment seek to move the Marketing Funds into different accounts unknown to adidas and potentially beyond the reach of this Court.

Preventing such an unjust outcome is the purpose of New York's legal regime providing for the *ex parte* attachment of assets in aid of arbitration.  *See* N.Y.C.P.L.R. §§ 6201; 7502.  The Court also possesses inherent equitable power to attach specific funds in which a party claims an

interest. Because Petitioner owns the Marketing Funds pursuant to the terms of the Licensing Agreement and has a basis to believe that the Marketing Funds will be moved imminently, Petitioner requests that this Court attach up to $75 million of Respondents' assets held at JP Morgan Chase in New York in order to preserve the status quo pending the resolution of the dispute through arbitration.

## STATEMENT OF FACTS

### A. The Parties

Petitioner adidas is a German entity with its primary US presence in Oregon. Declaration of Keith McIntire dated November 11, 2022 ("**McIntire Decl.**"), ¶ 5(a).

Respondent Yeezy, LLC is a Delaware limited liability company not registered to do business in New York. *Id.*, ¶¶ 5(b),(e), Ex. 1, at 1.

Respondent Yeezy Marketing LLC is a limited liability company not registered to do business in New York. *Id.*, ¶¶5(e). In the 2017 Agreement, Yeezy Marketing LLC is listed as a California entity, but it appears to currently be domiciled in Wyoming. *Id.,* ¶ 5(c). Yeezy Marketing LLC is jointly and severally liable for Ye and Yeezy, LLC. *Id.*, ¶ 5(h), Ex. 1, at 20.

Yeezy Footwear LLC is an affiliate of Yeezy, LLC, and is jointly and severally liable with Yeezy, LLC. *Id.*

Ye owns substantially all of Yeezy, LLC. *Id.* ¶5(g), Ex. 1, at 15. Ye wholly-owns Yeezy Marketing LLC and Yeezy Footwear LLC, either directly or through other entities which are wholly-owned by him. *Id.*, ¶ 5(g), Ex.1, at 14, 15. Ye controls both Yeezy, LLC, Yeezy Marketing LLC and Yeezy Footwear LLC. Ye is also a party to the Agreement and is required to substitute himself for Yeezy LLC in the event that it ceases to exist or fails to perform. *Id.*, ¶ 5(f), Ex. 1, at 9.

## B. The Contractual Framework

In 2016, the Parties entered into the 2017 Agreement, which concerned the international sale and promotion of footwear and apparel (the "**Products**"). Ex. 1, at 1. As relevant here, the 2017 Agreement was amended by an Amendment on September 30, 2019 (the "**2019 Amendment**"), a January 10, 2020 Payment Confirmation (the "**January 2020 Payment Confirmation**"), a February 18, 2020 Payment Confirmation (the "**February 2020 Payment Confirmation**") and an August 15, 2020 Payment Confirmation Letter (the "**August 2020 Payment Confirmation,**" jointly referred to as the "**Agreement**"). McIntire Decl., ¶ 3, *see, generally* Ex. 1. In his individual capacity, Ye is also a party to the Agreement and is required to substitute himself for Yeezy in the event the company ceases to exist or fails to perform. Ex. 1, at 9; McIntire Decl., ¶ 11, Ex. 3, at 1-2.

### 1. Marketing Funds

The Agreement provided the framework for what ultimately became several billions of dollars of sales of the Products. McIntire Decl., ¶ 4. As part of that framework, and central to this petition, the Agreement provided that adidas would provide marketing funds to Yeezy, which were to be used for the sole purpose of promoting the Products (the "**Marketing Funds**"). McIntire Decl., ¶ 7, Ex. 1, at 12. The Marketing Funds did not belong to Ye or Yeezy, could only be used for qualifying marketing purposes as defined in the Agreement, and upon termination of the Agreement, for any reason, any unspent Marketing Funds provided over the prior twelve months were to be returned to adidas. McIntire Decl., ¶ 7, Ex. 1, at 19.

Over the past 12 months, adidas has provided $75 million in Marketing Funds to Yeezy. McIntire Decl., ¶ 13, Ex. 4, at 1. Petitioner is aware that Yeezy and its affiliated entities hold bank accounts at JPMorgan Chase Bank, N.A (the "**Garnishee**") in New York, as well as in

3

Wyoming. McIntire Decl., ¶¶13, 14; McIntire Decl., ¶ 14, Ex. 5, at 1-2; McIntire Decl., ¶ 13, Ex. 4; at 1. Of the $75 million in Marketing Funds adidas has provided in the past 12 months, $50 million were paid to bank accounts held by Yeezy Marketing LLC in Wyoming and, most recently, $25 million were paid to the Garnishee account in New York in July 2022. McIntire Decl., ¶ 13, Ex. 4, at 1; McIntire Decl., ¶ 14, Ex. 5, at 1, 2. Based on the contractual requirement that Marketing Funds be held in a segregated account, and the instructions from Yeezy to direct ▉▉▉▉▉▉▉▉▉▉ Marketing Funds to an account at Garnishee, adidas has reason to believe that some or all of the $50 million from the Wyoming accounts has been transferred to the Garnishee. McIntire Decl., ¶14; Ex. 5, at 1, 2.

    2.     Agreement to Arbitrate

The parties agreed that "any disputes arising out of or relating to [the] Agreement or the breach, termination, enforcement, interpretation or validity thereof … shall be determined by arbitration in Portland Oregon before one (1) arbitrator." Ex. 1, at 7-8. The "Arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules." Ex. 1, at 19. The applicable JAMS Rules provide that "[a]ny recourse by a Party to a court for interim or provisional relief shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate." JAMS Rule 24(e), effective June 1, 2021.

**C.    Ye's Pattern of Misconduct**

The Agreement gives adidas the right to terminate in the event that Ye or Yeezy ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

4

███████████████████████████████████████████████ Earlier this year, Ye made a series of highly public and offensive statements which violated the terms of the Agreement, destroyed billions of dollars of brand value, and ultimately caused adidas to terminate the Agreement.  McIntire Decl., ¶ 10; Ex. 3, at 1-3.  On October 3, 2022, at a high-profile fashion show for his "Yeezy Season 9" fashion line, Ye and several other participants wore t-shirts designed by Ye with the white-supremacist slogan "White Lives Matter."  McIntire Decl., Ex. 2, at 1, Vanessa Friedman, There is No Excuse for Ye's 'White Lives Matter' Shirt, NY Times (Oct. 4, 2022).  In response to this reprehensible conduct, among other issues, adidas publicly announced that the company was placing its partnership with Ye "under review."  Ex. 2, at 5, Adidas puts Kanye West Yeezy deal under review, BBC (Oct. 7, 2022); Id., at 9, Ross Dwyer, adidas Has Placed the Yeezy Partnership "Under Review", Hypebeast (Oct 6, 2022).  On October 6, 2022, and in response to adidas, Ye posted on Instagram: "FUUUUUUCK ADIDAS I AM ADIDAS ADIDAS RAPED AND STOLE MY DESIGNS."  Ex. 2, at 12, Marisa Dellatto, Kanye West's Antisemitic, Troubling Behavior – Here's Everything He's Said in Recent Weeks, Forbes (Nov. 7, 2022).

In addition, on October 7, 2022, Ye posted to Instagram several screenshots of a text message exchange with music impresario Sean J. Combs, aka Diddy, in which Ye told Diddy: "Ima use you as an example to show the Jewish people that told you to call me that no one can threaten or influence me."  Id., at 14; Id., at 21; Id., at 20, Andrew Limbong, Twitter Follows Instagram in restricting Ye's account after antisemitic posts, NPR (October 10, 2022).  Later that weekend, Ye posted on his 31-million-follower Twitter account: "[W]hen I wake up I'm going death con 3 On JEWISH PEOPLE" and "You guys have toyed with me and tried to black ball anyone whoever opposes your agenda."  Id., at 21.  This tweet has been widely condemned and

was covered by the mainstream media. Twitter unilaterally deleted the tweet and locked Ye's account for violating its terms of service. Then, On October 15, 2022, in an appearance on the popular "Drink Champs" internet show and podcast, Ye made several additional and even more extreme racist and antisemitic comments. Alongside a litany of conspiracy theories and other antisemitic statements, Ye declared: "I can literally say antisemitic shit and they can't drop me. I can say antisemitic things and adidas can't drop me. Now what? . . . That's the position. . . . Ima hold my ground. I'm not backing down."[1]

As a result of Ye's statements, ██████████████████████████ ████████ the adidas board announced that it would terminate the License Agreement on October 25, 2022. That announcement set in motion a contractual notification and consultation provision, which culminated with adidas sending a termination letter to Ye and Yeezy on November 5, 2022 (the "**Termination Letter**"), exercising its termination rights pursuant to Section 34(A)(vii) of the Agreement. Ex. 3, at 1; *see* Ex. 1, at 3-4. Pursuant to the self-executing language in paragraph 4 of the August 15, 2020 Payment Confirmation, Yeezy and its affiliates were required to return to adidas an amount of its funds equal to the total amount of Marketing Fund payments made by adidas to Yeezy LLC in the last 12 months—which amounts to $75 million less any qualifying marketing expenditures made by Yeezy during this time period that Yeezy can demonstrate complied with the Agreement. McIntire Decl., ¶ 7; Ex. 1, at 19. adidas included a demand for return of these funds in the Termination Letter but has not had any response from Respondents. McIntire Decl., ¶ 12; Ex. 3, at 1-2.

---

[1] Ye's appearance was initially accessible on the Drink Champs YouTube channel at https://www.youtube.com/watch?v=-ZmbP5vIbyk, but viewing has been restricted at the time of this statement due to the public outcry in response to Ye's comments. However, several recordings of the episode remain readily available on YouTube as of the time of this statement, including at https://www.youtube.com/watch?v=J0tv2uXZQzw, last visited November 7, 2022.

In an email apparently sent by the Garnishee which was leaked to the press on October 12, 2022, and as reported by many news outlets, the Garnishee chose to end its relationship with Yeezy and its affiliated entities. McIntire Decl., ¶ 15, Ex. 6, at 12; *see also* Ex. 6, at 1, Tom Skinner, Kanye West responds after JPMorgan Chase severs ties with him, NME (October 13, 2022); *Id.*, at 8, Laura Snapes, Kanye West: bank JP Morgan Chase cuts ties with rapper, The Guardian (October 44, 2022), *Id.*, at 10, Ken Sweet, Banking breakup between Ye, JPMorgan planned for weeks, APNews (October 14, 2022). On or after November 21, 2022, Garnishee intends to close any of Ye or Yeezy's open accounts, and after deduction of any permissible service charges and pending transactions, remit all remaining funds in the form of a check delivered to the Yeezy or transfer to another financial institution indicated by Ye or Yeezy. Ex. 6, at 12. Under the Agreement, the Marketing Funds may not be disbursed to Ye or Yeezy. Ex. 1, at 12; *see* McIntire Decl., ¶¶ 7, 12.

In order to obtain the return of its property and recover damages for losses caused by Yeezy's breaches of the Agreement, adidas intends to commence arbitration promptly, and in any event within 30 days of an order of attachment issued by this Court. McIntire Decl., ¶ 16.

## ARGUMENT

### I. The Court Has Jurisdiction

The Court has federal question jurisdiction under 28 U.S. Code § 1331, as this Petition is in support of an international arbitration proceedings to be brought pursuant to an arbitration agreement governed by the New York Convention. 9 U.S.C. § 201 *et seq*. Chapter 2 of the Federal Arbitration Act, implementing the New York Convention, provides that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States." 9 U.S.C. § 203. The Convention, in turn, covers arbitration agreements and

7

awards arising out of commercial relationships where one party is not a citizen of the United States.  9 U.S.C. § 202.

In order for the Convention to apply, four criteria must be met: (*i*) there must be a written agreement; (*ii*) the agreement must provide for arbitration in the territory of a signatory of the Convention; (*iii*) the subject matter must be commercial; and (*iv*) the agreement cannot be entirely domestic in scope.  *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*,198 F.3d 88, 92 (2d Cir. 1999) (discussing four requirements for enforcement of arbitration agreements under the Convention); *see also Pike v. Freeman*, 266 F.3d 78, 85 n. 4 (2d Cir.2001)) (listing same essential requirements in three parts); *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1018 (2d Cir.1993) (same)).  Each of those requirements is satisfied insofar as the 2017 Agreement contains an express arbitration agreement; provides for arbitration in the United States, which has ratified the Convention; concerns the design, production and marketing of footwear and other products, all of which constitute commercial activity; and is both between a German company and domestic companies and addresses the international sale and promotion of the Products.  McIntire Decl., ¶¶ 4-5; Ex. 1, at 1, 7-8, 18-19.  Accordingly, this Court has federal question jurisdiction under 28 U.S. Code § 1331 and the FAA.

Alternatively, the Court has diversity jurisdiction pursuant to 28 U.S. Code § 1332 as there is complete diversity of citizenship between the Parties and the amount in controversy exceeds $75,000.  adidas is a German entity with its primary US presence in Oregon.  McIntire Decl., ¶ 5(a); Ex. 1, at 1.  Yeezy LLC is a Delaware limited liability company and Yeezy Marketing LLC is a Wyoming limited liability company (despite representing themselves as a California limited liability company for the purposes of the Agreement).  McIntire Decl., ¶ 5(b),(c).  Ye, who owns or substantially controls all Yeezy entities, is domiciled in California,

and there are no known members of any Yeezy entity with a presence in Oregon or outside the United States.  *Id.*, at ¶ 4, 5 (g); Ex. 1, at 14, 15.  As is relevant here, the minimum amount in controversy is the $75 million of Marketing Funds paid to Yeezy over the past 12 months.  McIntire Decl., ¶ 13; *see, generally* Ex. 6, at 12, Ex. 4, Ex. 5.

II.    **The Court Should Issue An *Ex Parte* Order Of Attachment**

Yeezy currently possesses up to $75 million of adidas' Marketing Funds to which it has no legal right, some portion of those funds are in accounts maintained by the Garnishee, and the Garnishee intends to close all those accounts by November 21, 2022—leading Yeezy to move those funds to unknown accounts and threatening to make their recovery difficult or impossible.  New York law provides for *ex parte* orders of attachment in aid of arbitration when, as here, an arbitration award may be rendered ineffectual without preliminary relief.  N.Y.C.P.L.R § 7502(c).

Alternatively, the Court should exercise its equitable authority to order the requested attachment, in order to preserve the status quo, prevent Respondents from dissipating adidas's funds, and allow for an orderly resolution of the parties' disputes through arbitration.

A.    **The *Ex Parte* Order of Attachment should be issued under New York law**

New York Civil Practice Laws and Rules § 6211(a) provides that an "order of attachment may be granted without notice, before or after services of summons and at any time prior to judgment." N.Y.C.P.L.R. § 6211(a).  On an application for an order of attachment, a petitioner must show, by affidavit and other written evidence, that: (1) there is a cause of action, (2) it is probable that the plaintiff will succeed on the merits, (3) the amount demanded from the defendant exceeds all counterclaims known to the plaintiff, (4) that one of the five grounds articulated in N.Y.C.P.L.R. § 6201 is satisfied, and (5) that the arbitration would be rendered

ineffectual without the attachment of the assets at issue. N.Y.C.P.L.R. §§ 6201, 6211, 7502(c). Each of those requirements has been met.

*First*, adidas has multiple causes of action against Yeezy, resulting from Ye's highly public and offensive conduct described above, which violated the terms of the Agreement and justified adidas's termination of that contract. Those broader causes of action, as well as the dispute over rights to the remaining Marketing Funds and Yeezy's use of expended Marketing Funds, will be resolved through arbitration. As is relevant to the requested order, Yeezy is in possession of up to $75 million of Marketing Funds provided over the last 12 months which adidas made available to Yeezy in order to promote Products. Ex. 4; Ex. 1, at 11-12; McIntire Decl., ¶¶ 7, 13. Any unspent or misappropriated portion of those funds belong to adidas, despite being in Yeezy's possession, and must be returned upon termination of the Agreement for any reason. Ex. 1, at 19. Ye's public, brand damaging and antisemitic conduct is well documented, and in clear violation ████████████████████████ McIntire Decl., ¶ 10; Ex. 1, at 3-4; *see, generally* Ex. 2. Accordingly, adidas was justified in terminating the Agreement, and Yeezy must now return to adidas the Marketing Funds in its possession. Because Yeezy has failed to return the Marketing Funds, or even respond to adidas' request for their return, adidas has a clear cause of action to recover possession of those funds, which will be adjudicated in the forthcoming arbitration. McIntire Decl., ¶ 16.

*Second*, not only is it "probable that the [adidas] will succeed on the merits" of that claim, (N.Y.C.P.L.R § 6211(a)), it is a near certainty adidas they will do so. In assessing this element, adidas is to be afforded "afforded "the benefit of all legitimate inferences and deductions that can be made from the facts stated." *Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 43 F.4th 263, 270 (2d Cir. August 5, 2022). On its face, and as described above the Agreement indicates that upon

10

termination for any reason, any Marketing Funds provided over the last 12 months and not spent on valid marketing expenses must be returned adidas.  adidas has provided Yeezy with the beneficial use of a total of $75 million over the last 12 months, none of which has been returned. McIntire Decl., ¶ 12; Ex. 4.  Accordingly, there is no question that adidas has a meritorious claim to take back possession of its own unspent Marketing Funds.

*Third*, although Yeezy has asserted claims against adidas relating to an alleged breach of the Agreement, those claims (which may or may not ultimately be pursued further by Yeezy) are more than offset by adidas' forthcoming claims for damages arising from Ye's breaches, which include the destruction of a business line that generated billions of dollars in annual sales. McIntire Decl., ¶ 10.  Moreover, the Agreement caps ████████████████████████ ████████, far less than the $75 million of Marketing Funds at issue, let alone adidas' broader claims.  Ex. 1, at 19.  And with respect to the requested attachment, even if Yeezy's claims were successful, they would not entitle Yeezy to retain unspent Marketing Funds belonging to adidas. Because adidas' claims against Yeezy – both in total, and in respect to the specific dispute over the Marketing Funds – exceed in value Yeezy's claims against adidas, attachment in aid of arbitration is warranted.

*Fourth*, none of Yeezy, LLC nor Yeezy Marketing LCC nor Yeezy Footwear LLC is registered to do business in New York. Therefore, to the extent that adidas is obligated to satisfy the requirements of N.Y. C.P.L.R. § 6201, it clearly does so.[2]  *Discover Growth Fund v. 6D*

---

[2]   There is some dispute among New York courts as to whether the requirements of 6201 are applicable in the context of a petition for attachment in support of arbitration.  *See Mishcon de Reya New York LLP v. Grail Semiconductor, Inc.*, 11 cv 04971(RJH) 2011 WL 6957595, at *8 (S.D.N.Y. Dec. 28, 2011) (not required to satisfy CPLR § 6201); *see also Sivault Sys., Inc. v. Wondernet, Ltd.*, 05 cv 0890(RWS), 2005 WL 681457, at *3 n. 1 (S.D.N.Y. Mar. 25, 2005) ("The grounds for attachment set forth in Section 6201 are, by the express terms of Section 7205(c), inapplicable to petitions for orders of attachment brought pursuant to that latter section."); *but see Erber*, 303 A.D.2d at 165 (1st Dept. 2003) ("[T]he criteria for provisional relief set forth in CPLR articles 62 and 63 are not relaxed when such relief is sought in aid of arbitration pursuant to CPLR 7502(c).").  To the extent these requirements are applicable, they are satisfied.

11

*Global Technologies Inc.*, 2015 WL 6619971 at *4 n.5 ("There is no serious dispute that Discover could satisfy the grounds set forth in CPLR 6201(1) in that [Respondent] is a foreign corporation-it is a corporation organized under the laws of Delaware-and is not qualified to do business in New York.").

*Finally*, "the award to which the applicant may be entitled may be rendered ineffectual without [the] provisional relief" sought here. N.Y.C.P.L.R. § 7502(c). The Second Circuit "has stated that such a requirement amounts to inquiring whether the petitioner 'has need for the attachment.'" *Mischon de Raya New York LLP v. Grail Semiconductor, Inc*, 2011 WL 6957595, at *3 (S.D.N.Y. December 28, 2011) (quoting *Capital Ventures Int'l v. Rep. of Arg.*, 443 F.3d 214, 221 (2d Cir. 2006). The mere "possibility […] that absent the attachment being requested, the ultimate award would be severely compromised" is sufficient to satisfy N.Y.C.P.L.R. § 7502(c). *See, e.g., County Natwest Sec. Corp. USA v. Jesup, Josephthal & Co.*, 579 N.Y.S. 2d 376, 377 (1st Dep't 1992) (holding that an attachment should have been granted to the petitioner); *Moquinon, Ltd. v. Gliklad*, 2017 WL 1482163, at *5, *8 (Sup. Ct. N.Y. Co. April 6, 2017) (holding the petitioner met its burden to obtain an order of attachment).

In an email leaked on October 12, 2022, the Garnishee has stated its intent to terminate its banking relationship with Yeezy by November 21, 2022, including closing the accounts in which adidas' Marketing Funds reside, and making those funds payable to Yeezy via check. McIntire Decl., ¶15; Ex. 6, at 12. If that occurs, adidas' Marketing Funds could be comingled with the unknown balance of Yeezy's other funds in other financial institutions, such that it would be more difficult if not impracticable to audit those accounts and determine which monies are owned by adidas. That practical challenge is compounded by the risk that, once the funds are transferred out of the known accounts, that they will be dissipated before adidas can locate them

12

again, or moved to a jurisdiction where recovery would be more difficult, expensive or simply impossible. Adidas specifically guarded against this eventuality by requiring that Marketing Funds be held in a segregated account and prohibiting Marketing Fund from being distributed to Yeezy LLC or Ye. Those restrictions are only more important now that Yeezy it obliged to return the Marketing Funds to adidas

### B. Alternatively, the Court should exercise its equitable authority to issue an order of attachment

If the Court were to find that adidas is not entitled to an attachment order by law (which it is), the Court would still have the equitable authority to issue such an order to prevent Yeezy from retaining possession of funds in its possession which rightfully belong to adidas.

The question of whether a court may grant a preliminary equitable relief turns on "whether the injunction acts 'in aid of the recovery' sought in equity." *Shamrock Power Sales, LLC v. Scherer*, No. 12CV8959KMKJCM, 2016 WL 6102370, at *3 (S.D.N.Y. Oct. 18, 2016) (citing *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 289 (1940)).[3] When, as is the case here, petitioners "seek both equitable and legal relief in relation to specific funds, a court retains its equitable power to freeze assets." *Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of VA.*, 144 F. Supp. 2d 241, 250 n. 9 (S.D.N.Y. 2001) (emphasis omitted); *see also*

---

[3] Courts in other circuits have held similarly. *See e.g., United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 497 (4th Cir. 1999) (developing a two-part test where the court determines whether the claims are cognizable in equity, and second, whether the preliminary injunction is a reasonable measure to preserve the status quo in aid of the claims in the suit); *see also Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc.*, 77 F. Supp. 2d 199, 204 (D. Mass. 1999) (asking whether "the claims in the suit seek cognizable relief in equity against specific assets of the defendant" before considering whether "a preliminary injunction freezing these assets [would] be a reasonable measure to preserve the status quo in aid of the ultimate equitable relief claimed" (internal quotation marks omitted)).

13

*Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, No. 11 CIV. 3489 JMF, 2013 WL 1915330, at *2–3 (S.D.N.Y. May 9, 2013) (same); *Wishnatzki & Nathel, Inc. v. H.P. Island–Wide, Inc.*, 2000 WL 1610790 (S.D.N.Y. Oct. 27, 2000) (holding funds in PACA trust subject to preliminary injunction upon showing of imminent danger of dissipation). Ultimately, "the question of whether a court may afford the type of preliminary relief sought here turns on whether the injunction acts 'in aid of the recovery' sought in equity." *Shamrock Power Sales, LLC v. Scherer*, No. 12CV8959KMKJCM, 2016 WL 6102370, at *3.

Here, Yeezy is in possession of adidas' Marketing Funds, which the Agreement clearly indicates were being provided to Yeezy for the sole purpose of promoting the Products which were the subject of that agreement. Ex. 1, at 11-12, 19. Upon termination of the Agreement, for any reason, Yeezy must return any unspent marketing funds provided over the last twelve months to adidas. Over the past 12 months, adidas has provided Yeezy with $75 million in Marketing Funds, at least a substantial portion of which are in the accounts maintained by the Garnishee. As discussed above, the Agreement was terminated effective November 5, 2022, due to the repeated, offensive, antisemitic, public and harmful conduct of Ye, which constituted grounds for termination of that agreement. Ex. 1, at 4. Accordingly, the Marketing Funds provided over the last 12 months, which were never Yeezy's property, but rather were provided by adidas for the sole purpose of marketing the Product, must be returned to their owner, adidas, less any amounts spent in strict compliance with the Agreement. Ex. 1, at 11-12, 19.

This interim, equitable relief is necessary to preserve the status quo, facilitate taking inventory of the marketing accounts, and preclude dissipation of adidas' property. *See New Falls Corp. v. Soni Holdings, LLC*, No. CV19449ADSAKT, 2019 WL 4015170, at *10 (E.D.N.Y. July 5, 2019) (issuing injunction because it "is reasonably necessary to preserve the status quo with

14

respect to particular assets so that the court can grant the movant ultimate relief"). Accordingly, this Court should use its equitable authority to attach Yeezy's accounts held by the Garnishee up to the amount of $75 million.

### III. The Order Of Attachment Should Encompass All Of Defendant's Accounts At JP Morgan Up To The Amount of $75 Million.

Over the last 12 months, adidas provided $75 million in Marketing Funds, and there can be no serious dispute regarding Yeezy's obligation to return any unspent Marketing Funds to adidas now that the Agreement has been terminated.  Ex. 3, at 1-2; McIntire Decl., ¶12; Ex. 1, at 12, 19.  Because Yeezy failed to respond to adidas' request for return of the unspent Marketing Funds and an audit of that spending, it remains unknown how much of the Marketing Funds have been spent on valid marketing expenses, how much remains in Yeezy's accounts (in New York or elsewhere), and the extent to which those funds were misappropriated or misused by Yeezy. McIntire Decl., ¶ 14.  Attaching up to $75 million in Yeezy's accounts of maintained by the Garnishee will preserve the status quo, prevent the Garnishee from closing those accounts, and allow the parties to audit and conduct an inventory of the Yeezy accounts in the context of an arbitration proceeding to resolve any dispute over adidas' entitlement to the funds.

Dated: New York, New York
November 11, 2022

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By: _____

Mark P. Goodman (mpgoodman@debevoise.com)
William H. Taft V (whtaft@debevoise.com)
Floriane Lavaud (flavaud@debevoise.com)

919 Third Avenue
New York, New York 10022
(212) 909-6000 (Main Office Number)

*Counsel for Plaintiff adidas AG*